**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANTHONY FLETCHER,<br><br>Plaintiff,<br><br>v.<br><br>MORGAN STANLEY & CO. LLC, MORGAN STANLEY SMITH BARNEY LLC, AND MORGAN STANLEY,<br><br>Defendants. | Case No.<br><br>**Jury Trial Demanded** |

**COMPLAINT**

Plaintiff Anthony Fletcher, by and through his attorneys, Stowell & Friedman, Ltd., and Ben Crump Law, PLLC, hereby files this Complaint against Defendants Morgan Stanley & Co. LLC, Morgan Stanley Smith Barney LLC, and Morgan Stanley (collectively “Defendant,” “Morgan Stanley” or “the Firm”).

1. Due to decades of entrenched race discrimination, Black professionals are nearly absent from the financial advisor, management, and executive ranks at Morgan Stanley. Unable to source, hire, or retain Black talent, Morgan Stanley hired Anthony Fletcher, a highly respected and successful Black professional recruiter. But Fletcher could not escape the same racial bias faced by Morgan Stanley’s Black employees. Though Fletcher presented Morgan Stanley with candidates of all races, Morgan Stanley limited Fletcher to “diverse” hires, who the Firm paid less and hired into lower roles. Morgan Stanley excluded Fletcher from standard tools for his job, hired Fletcher’s candidates without his knowledge and behind his back, denied him commissions he earned, and paid him lower rates for his work, all because of his race. When Fletcher had the

courage to report the discrimination he and his candidates faced, Morgan Stanley retaliated against him and terminated his contract.

2. Fletcher files this lawsuit to challenge Morgan Stanley's race discrimination against himself and others and to attain a fair recovery for his losses and meaningful and lasting reforms to achieve a level playing field and equal employment opportunities for all.

**JURISDICTION AND VENUE**

3. Plaintiff's claims arise under 42 U.S.C. § 1981 and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367 because they arise out of the same nucleus of operative facts.

4. Venue is proper in this District pursuant to 28 U.S.C. §1391(b). Plaintiff resides in this District, and Defendants are licensed to do business and maintain offices in this District.

**PARTIES**

5. Defendant Morgan Stanley is a publicly traded, global financial services firm and Fortune 500 company incorporated in Delaware and headquartered in New York. As part of its wealth management services, Morgan Stanley employs more than 55,000 employees in the United States, including approximately 16,000 financial advisors ("FAs").[1] Morgan Stanley is registered with the Securities and Exchange Commission as a broker-dealer and with the Commodity Futures Trading Commission as a futures commission merchant. In 2022, Morgan Stanley's wealth management business managed over $4 trillion in client assets, with revenues of $53.67 billion, and profits of $11 billion.[2]

[1] Morgan Stanley, Form 10-k at 7 (Feb. 24, 2023), available at https://www.morganstanley.com/content/dam/msdotcom/en/about-us-ir/shareholder/10k2022/10k1222.pdf.
[2] *Id.* at 73.

6. Plaintiff Anthony Fletcher is African American and resides in Orland Park, Illinois. Fletcher is the sole owner of My Future Consulting, Inc., a recruitment firm specializing in helping large companies recruit and place talent. Morgan Stanley contracted Fletcher to provide recruitment services from 2015 until 2022 when Morgan Stanley unlawfully terminated Fletcher's contract.

## FACTUAL BACKGROUND

### I. Morgan Stanley's Legacy of Discrimination

7. Morgan Stanley has a long and ongoing history of systemic, intentional discrimination against its wealth management workforce and in its wealth management business unit.

8. The Equal Employment Opportunity Commission ("EEOC"), as well as African American and female employees, have sought to hold Morgan Stanley accountable in a myriad of legal proceedings. In the 1970s, the EEOC sued Morgan Stanley's predecessor, Dean Witter, for engaging in a class-wide pattern and practice of race and sex discrimination with respect to recruitment, hiring, assignment, training, promotion, and other terms and conditions of broker employment. *See EEOC v. Dean Witter & Co, Inc.*, No. 78-839 (E.D. Pa.). In 2001, the EEOC again sued Morgan Stanley on behalf of a class of female sales employees, alleging that Morgan Stanley did not fairly promote and compensate women, in violation of Title VII. Consent Judgment, *EEOC v. Morgan Stanley & Co.*, No. 01-cv-08421 (S.D.N.Y. July 13, 2004), ECF No. 236. Morgan Stanley settled the case in July 2004 for $54 million.

9. After decades with no meaningful progress, in June 2006, female Morgan Stanley FAs challenged unequal pay and account distributions in the class action sex discrimination lawsuit *Augst-Johnson v. Morgan Stanley & Co.*, No. 06-cv-1142 (D.D.C.). In April 2007,

Morgan Stanley agreed to settle that case for $46 million and agreed to enact programmatic relief.

10. Around the same time, a group of 14 current and former African American Morgan Stanley FAs from ten offices in California, Indiana, and Illinois notified Morgan Stanley of the pattern and practice of intentional race discrimination they had suffered at the Firm, including its discriminatory account distribution and teaming policies. Morgan Stanley pretended to negotiate meaningful policy reforms in good faith with this group of committed employees. In reality, however, the Firm secretly sought to end its liability on the cheap by negotiating to transform a dormant putative gender discrimination class action into a bargain race, color, and national origin class action settlement, *Jaffe v. Morgan Stanley & Co.*, No. 3:06-cv-03903 (N.D. Cal.). The only *Jaffe* class representative at the time did not attend the mediation, rejected the proposed settlement, and was then replaced by another African American former employee who received $125,000 to resolve her arguably time-barred individual claims. Latinos were added to the *Jaffe* settlement class without the presence or participation of a Latino class representative.

11. In October 2007, Morgan Stanley announced it would settle the transformed *Jaffe* case for $16 million, to be distributed among a class of 1,300 African American and Latino employees.[3] While the settlement was low, the magnitude of the discrimination underlying the *Jaffe* settlement was extreme. Evidence was presented to the *Jaffe* court by a labor economist who had studied years of Morgan Stanley's FA compensation and workforce data and found that African American FAs were "systematically disadvantaged by policies and practices at Morgan

[3] That the *Jaffe* settlement undervalued the claims was plain after the settlement, when a nearly identical class action lawsuit against Morgan Stanley's competitor Merrill Lynch was settled for $160 million, ten times the $16 million *Jaffe* settlement, for the same number of class members. *See* Settlement Agreement and Release at VIII.A, *McReynolds v. Merrill Lynch*, No. 05-cv-6583 (N.D. Ill. Aug. 28, 2013), ECF No. 585-1.

Stanley relating to compensation and other terms and conditions of employment." The statistical studies found that African Americans: (1) were paid materially less than white FAs, (2) had substantially higher rates of turnover than white FAs, and (3) were hired into FA and FA trainee positions at materially lower rates as compared to external availability rates. Klein Decl at ¶¶ 3–8, *Jaffe* (Nov. 19, 2007), ECF No. 104; *see, e.g.*, Am. Tr. of Proceedings on Dec. 3, 2007, at 15, *Jaffe* (Jan. 23, 2009), ECF No. 259 ("[I]n addition to being fairly low numbers that were hired, African-Americans . . . had far greater turnover" than whites); *id.* at 14–16 (FA trainee workforce dropped to about 1.7% African American).

12. Over substantial opposition and after numerous hearings, the *Jaffe* court approved the "low" settlement, relying in part on the programmatic relief that the parties represented would improve opportunities for African American (and Latino) FAs.

13. The fourteen African American former Morgan Stanley FAs mentioned above opted out of the *Jaffe* settlement, choosing to pursue their own race discrimination claims instead. In that suit, *Moore v. Morgan Stanley*, the plaintiffs amassed considerable evidence of the Firm's rampant race discrimination and defeated summary judgment. Morgan Stanley settled on the eve of trial. Minute Entry, No. 07-cv-05606 (N.D. Ill Mar. 10, 2009). As part of the *Moore* joinder lawsuit, Professor Phillip Atiba Goff, a renowned social science expert regularly hired by police forces combating race discrimination in their police work, reviewed the record and concluded, among other things, that the "employment policies and practices at Morgan Stanley are of the type likely to lead to racial bias, particularly given the under representation of Blacks and cultural aspects of the Firm." Expert Report of Phillip Goff at 5, *Moore* (Dec. 31, 2008), ECF No. 258-2. Professor Goff added that the "facts of the case in *Moore v. Morgan*

*Stanley & Co., Inc.* suggest that racial discrimination as understood by contemporary social science was likely present." *Id.*

14. Due to Morgan Stanley's hostility to African Americans, the lip-service reforms in the *Jaffe* settlement have failed, and, as intended, Morgan Stanley's discriminatory policies and practices continue in full force. Indeed, Morgan Stanley never complied with the programmatic relief to which it agreed in two nationwide class action settlements, the race and color *Jaffe* settlement or the sex discrimination *Augst-Johnson* settlement. African American FAs continue to be excluded from the Firm's racially segregated partnerships or teams and continue to have substantially lower earnings and higher attrition than white FAs. Morgan Stanley's performance is so abysmal that it agreed to extend certain aspects of the programmatic relief and settlement agreements in the *Jaffe* and *Augst-Johnson* cases for an additional two years, until September 30, 2017. Stipulation and Order to Extend Jaffe Settlement Agreement, *Jaffe* (Sept. 30, 2015), ECF No. 301; Order Approving Mot. to Extend Consolidated Settlement Agreement, *Augst-Johnson* (Apr. 7, 2016), ECF No. 79.

15. In 2015, a group of African American financial advisors challenged Morgan Stanley's ongoing pattern and practice of race discrimination against Black FAs and failures to adhere to its promises in the *Jaffe* settlement and consent decree. *See Frazier et al. v. Morgan Stanley*, No. 16-cv-0804 (S.D.N.Y.), ECF 109-1 (Proposed Fourth Amended Complaint). Rather than fix its rampant race discrimination, Morgan Stanley decided to put an end to public litigation of its employees' civil rights claims. To insulate itself from negative publicity and legal liability, Morgan Stanley covertly forced its employees to confidential, private arbitration in a forum it controls for all discrimination claims, denying victims of discrimination the right to go to court and have a public trial before a jury of their peers. Nearly eight years since filing, the

*Frazier* plaintiffs continue to challenge their treatment and Morgan Stanley's systemic discrimination in court and in arbitrations across the country.

16. As the *Frazier* plaintiffs alleged, Morgan Stanley's racial discrimination is driven and maintained by its racially biased corporate culture, which is laden with harmful stereotypes about African American employees and clients. In sum, Morgan Stanley believes that white clients will not trust their money with Black FAs and that Black clients are not worthy of Morgan Stanley's business. Morgan Stanley denies African Americans advancement to management because of negative and false racial stereotypes about their leadership and abilities, and its belief that the Firm's mostly white financial advisor workforce will not work for African American managers.

17. Morgan Stanley's deeply rooted racial bias against African American employees and clients is reflected in candid statements by firm management and personnel across the country, for example:

- Following the murder of George Floyd, Head of Sales Jim McCarthy announced on a Firm-wide call that while Morgan Stanley was committed to increasing diversity, it would not "lower the bar" for Black applicants, who would instead have to "raise to the Morgan Stanley standard," or words to that effect.
- A Morgan Stanley manager discouraged a Black FA from pursuing a Black multi-millionaire client because "African Americans don't understand finances, they just want to buy things" and lack "the intellect to invest."
- A white FA told a Black FA he would not make it in the business because "Black people don't have money," or words to that effect.
- A manager told a Black FA, "some clients just don't want Black brokers," or words to that effect, and then took away her client and reassigned the client to a white FA.
- A high-ranking white FA argued the reason Morgan Stanley treated Black FAs worse is because this is "a white man's business," and Black FAs need to be able to "market to people they can relate to" (referring to Black clients).

- When a Black FA tried to team with a senior white FA, he said, "Why would I want to team with you? No one wants to team with people like you," meaning Black people.

- Another white FA told a Black FA: "Wealthy people want to work with people who look like them," meaning white, "Look around, do you see a lot of people who look like you?"

- A successful FA who was very close with management told a Black FA, "I don't know if this is the right business for you. A lot of people in this area are white and won't do business with you," or words to that effect.

- Racial slurs and hostile language abound in Morgan Stanley offices. For example, Firm employees referred to a Black FA as "Popolo," a Hawaiian racial slur akin to the n-word, in the presence of managers and without any repercussions.

- A manager admitted to a Black FA excluded from teams that a team would only include her because of her race and for the "firm picture," meaning to put on a show of diversity, not to be a real business partner.

- A manager directed an African American FA trainee to attend a marketing event for diverse clients and get contact information to assign to white FAs in the office.

- Morgan Stanley employees openly used racial stereotypes to describe African American FAs and clients, falsely accusing them of being "lazy" and "dishonest," and deeming African American clients or prospects disreputable and unworthy.

- African Americans were frequently and openly referred to as "the token black," "the black guy" or "the black lady," rather than by their names.

- A senior Morgan Stanley official repeatedly boasted in speeches that he talks to the "the African American help," meaning the janitors.

- A manager told the sole African American FA in an office that he had to watch her all the time and did not want her in his office, that he did not want to advertise on Black radio stations because it would paint the Firm in an unfavorable manner, and maligned her African American clients as not "credible or trustworthy" people.

- A white complex manager regularly referred to his African American colleague as "boy," without discipline or correction from the Firm.

- A white complex manager told a Black regional training officer that African Americans were inherently less capable of passing the Series 7 licensing and other examinations.

- Hiring managers told African American candidates that Black people had a hard time passing the psychological screening test.

18. The Firm's systemic discrimination against African Americans was observed and confirmed by senior Morgan Stanley executives, including the former Global Head of Diversity Marilyn Booker.

19. Marilyn Booker was Morgan Stanley's former Global Head of Diversity (and a 26-year employee), who sued the Firm in June 2020 for discrimination and retaliation after being fired for complaining about "the irrefutable and appalling patterns she saw regarding the hiring, retention, and lack of advancement of Black employees" and pushing for reforms to improve the lives of Black employees. *Booker v. Morgan Stanley*, 20-cv-02662 (E.D.N.Y.), Dkt. 19 at ¶ 8–9. Booker alleged that the discriminatory culture at Morgan Stanley started at the very top of the Firm with CEO James Gorman, and that "[c]learly, black lives did not matter at Morgan Stanley." *Id.* at ¶ 10–12. Booker alleged that from 2012–2020, Morgan Stanley appointed 1,382 Managing Directors, of which, only 2.23% were African American, and there were only 4 Black Managing Directors in wealth management. *Id.* at ¶ 55–56, 129.

20. Booker proposed project Genesis, "in response to the rampant bias against minority FAs and Trainees . . .to address their uniformly shared experiences, including . . . : (i) constant feelings of isolation and lack of support; (ii) inability to get onto FA teams; and (iii) barriers in their attempts to partner with White FAs on new business opportunities . . . ." *Id.* at ¶ 143. Booker described the allegations of *Frazier* plaintiffs as "what Project Genesis intended to address." *Id.* at ¶ 152–153. Morgan Stanley fired Booker directly after she proposed Project Genesis.

21. Booker also reported that the Firm's bias extended beyond its workforce to the "outrageously low number of Morgan Stanley clients who were Black." ¶ 119. As a result, Booker sought to partner with beloved African American celebrities, such as Ervin "Magic"

Johnson and Steve Harvey, to increase the Firm's exposure and improve its reputation in the Black community. *Id.* at ¶¶ 107–15. But Morgan Stanley flatly refused, instead preferring to work with a white British golfer. *Id.* at ¶ 117.

22. Morgan Stanley settled Booker's lawsuit just days before its CEO James Gorman was set to testify in front of Congress. Booker later reiterated Morgan Stanley's utter failure to address its rampant race discrimination and implement *Jaffe's* programmatic relief.[4]

23. A former Senior Diversity Officer at Morgan Stanley similarly confirmed the Firm's racially hostile culture and discrimination against African Americans. The Officer left Morgan Stanley less than two years into her tenure, and explained her reasons and pled for change to the Firm's entrenched race discrimination and biased culture in wealth management and toward Black employees in an impassioned letter. The Officer lamented that "the very notion of equity for diverse advisors and managers is oftentimes met with arrogant disapproval," and that "the net number of diverse advisors has barely changed in nearly a decade," largely because the Firm has "done little to nurture those very advisors who are already here." Ultimately, the Officer tried to convey to Morgan Stanley's senior leadership the experience she and so many African American employees face at Morgan Stanley:

> You cannot begin to imagine how it feels for a woman of color to be constantly reminded that neither your credentials, nor your title, nor your professional accolades, nor your expertise gleaned both from your professional and social experiences as a woman of color, are enough to counteract **the pervasive and systemic biases that run throughout this organization.**

24. The experiences of the Firm's own diversity executives support Plaintiff's allegations and serve as further evidence of Morgan Stanley's Firm-wide racial discrimination.

[4] Emily Flitter, *The White Wall: How Big Finance Bankrupts Black America* (pp. 209–10). Atria/One Signal Publishers. Kindle Edition (2022).

25. Morgan's Stanley's blatant and ongoing violations of the above settlement agreements are evidence of intentional discrimination. *See Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 415–16 (7th Cir. 1988).

**II. Morgan Stanley's Unlawful Conduct Harmed Anthony Fletcher**

26. The experiences of Plaintiff Anthony Fletcher are consistent with Morgan Stanley's decades-long pattern of race discrimination against African Americans.

27. Plaintiff Anthony Fletcher obtained his bachelor's degree in human resource management in 1988 and was quickly successful in corporate America. He was hired by a large manufacturing company where he excelled and advanced rapidly, becoming the youngest executive to serve as the head of manufacturing. Due to his extraordinary performance and stellar results, Fletcher was recruited to serve as head of manufacturing for other large companies, including Fortune 50 company PepsiCo.

28. As a senior executive, Fletcher routinely worked with and retained talent acquisition firms to recruit senior-level employees. Based on this experience, Fletcher founded his own talent acquisition firm, My Future Consulting, in 2007. Under Fletcher's direction, My Future Consulting experienced growth and success. Fletcher and his firm received overwhelmingly positive feedback and were retained by some of the largest companies in the country, across a wide array of industries, to provide recruiting and executive placement services.

29. In approximately 2014, during a national conference in Dallas, Texas, a Morgan Stanley Regional Diversity Officer ("RDO") admitted to Fletcher that Morgan Stanley needed help recruiting racially diverse talent. She explained that Morgan Stanley had been sued several times for race discrimination but still could not source, recruit, or retain Black financial advisors and other talent. From the onset, Morgan Stanley viewed Fletcher through the lens of his race,

consistent with the Firm's racially biased corporate culture and discriminatory race matching practices. Fletcher's firm was not limited to recruiting "diverse" talent, but because Fletcher is a Black man, Morgan Stanley considered him only to bolster its paltry "diversity" recruitment efforts.

30. Fletcher soon was introduced to Head of Diversity and Inclusion for Wealth Management Kara Underwood ("Underwood"), who was responsible for trying to improve Morgan Stanley's abysmal underrepresentation of minorities in the Firm's ranks. Underwood reiterated that the Firm was struggling to hire and retain African American talent, including wealth management field sales managers and executives. In approximately 2015, Morgan Stanley contracted with Fletcher and My Future Consulting to provide executive recruiting.

31. Almost immediately, Fletcher began to source and present to Morgan Stanley highly qualified market executive candidates. Within one year, Morgan Stanley hired approximately 6 African American market executives sourced by Fletcher. Underwood was effusive about Fletcher's success as compared with the Firm's past failings. She admitted that Morgan Stanley had only hired *one* diverse market executive in the past three years before contracting with Fletcher.

32. Because of Fletcher's success, Underwood asked Fletcher to meet monthly with the Firm's six RDOs to discuss successful strategies for recruiting and developing diverse talent. During these meetings, the obstacles to Black representation at Morgan Stanley became clear. For example, a white female RDO disclosed to Fletcher the lack of diverse representation in Morgan Stanley's senior wealth management ranks, including only four non-white Complex Directors at the time. She admitted Morgan Stanley had a "weak bench" of diverse talent, or words to that effect. The RDO rejected the idea of recruiting Black candidates, who the RDO

claimed would not be respected or accepted by rank-and-file Morgan Stanley financial advisors and would be "problematic" for the Firm. Fletcher noted that Morgan Stanley had recruited and hired countless white executives from outside the Firm without issue.

33. After his initial success placing several Black candidates with Morgan Stanley, he received less work and fewer position vacancies to fill from the Firm. Fletcher asked why he was not getting more referrals despite numerous available positions. A Morgan Stanley RDO explained that Morgan Stanley had met its internal diversity hiring goals and was no longer interested in hiring diverse candidates. Morgan Stanley hired only the bare minimum diverse candidates to meet its arbitrarily low "quota," but had no intention of hiring diverse candidates or engaging with diverse recruiters if that quota was filled.

34. Over time, Morgan Stanley rejected the vast majority of the well over 200 highly qualified diverse candidates Fletcher sourced, hiring only 16. Morgan Stanley rejected many of these well-qualified "diverse" candidates based on their race, age, or sex rather than their credentials. For example, one of the highest-ranking executives in wealth management rejected out-of-hand approximately 5 highly qualified and top-ranked Black candidates sourced by Fletcher based on false and racist stereotypes about their qualifications or "reputations."

35. Similarly, during his nearly seven years sourcing talent for Morgan Stanley, Fletcher sourced approximately 30 highly qualified diverse candidates for Complex Manager positions, including several talented Black women, none of whom were even interviewed. Indeed, Fletcher is not aware that Morgan Stanley has never employed a Black woman as Complex Manager in its nearly 90-year history.

36. Morgan Stanley's discrimination against candidates Fletcher sourced for the Firm denied him commissions. For example:

- **Regional Director Lisa Cregan** routinely refused to consider African American candidates Fletcher presented, especially for executive-level positions, falsely commenting that they had "bad reputations," or words to that effect. Cregan had a reputation for hiring few African Americans, and those few only to lower-level management positions where they were denied further advancement and equal opportunities. Indeed, Cregan has been charged with race discrimination, including by one of her former direct reports, John Lockette. Despite her abysmal track record of hiring, retaining, and advancing diverse employees, Morgan Stanley recently promoted Cregan to Head of Field Management Talent Readiness and Acquisition, where she is responsible for "hiring and training branch and complex managers as well as boosting diversity across those roles."[5]

- **Regional Director Nelson Gaertner** asked a Black candidate how much money he was making in his current position, contrary to law and firm policy. When Fletcher complained, a Morgan Stanley employee admitted to Fletcher that Morgan Stanley should get rid of Gaertner because of his open hostility to diversity. At the time Gaertner employed no African Americans at the branch manager position or above in his region. Despite Gaertner's abysmal track record of hiring, retaining, and advancing diverse talent, he is one of only four Regional Directors who won the job in a recent reorganization, and his territory and responsibilities have grown considerably.

- **A Morgan Stanley Complex Manager** refused to consider two highly qualified African American candidates who were over 50 for an Associate Complex Manager role, candidly admitting he wanted someone younger who he could "develop" and "mold" himself. The Complex Manager ultimately made a job offer to another candidate Fletcher presented who was significantly younger and less qualified. After Fletcher reported the discriminatory comments and actions, Morgan Stanley and the Complex Manager retaliated against Fletcher by rescinding the job offer to the younger candidate and denying Fletcher commissions.

- **A Morgan Stanley Executive Director** asked Fletcher to help him hire a diverse client service associate ("CSA"). When Fletcher asked what skills he was looking for, the Executive Director demanded the candidate be willing to laugh at his insensitive and inappropriate jokes, and leaned on racial stereotypes about a Black CSA's "cultural fit," including dressing professionally and not looking like they just came into the office from a late-night party. At no time did the Executive Director discuss with Fletcher the candidates' skills or professional experiences.

[5] Mason Braswell, *Morgan Stanley Trims Regional Management Ranks in Wealth Management Reorg*, ADVISORHUB (Jan. 23, 2023), https://www.advisorhub.com/morgan-stanley-trims-regional-management-ranks-in-wealth-reorg/.

37. It became obvious to Fletcher that Morgan Stanley reserved only a few markets and roles as acceptable for minority managers, and even when hired, they were treated as second class managers. Morgan Stanley paid Fletcher's Black candidates less than similar white candidates and less than their experience and qualifications warranted. Fletcher's Black candidates also routinely were required to accept lesser roles, with reduced responsibility and title, than the roles they had just held at a competitor. But Morgan Stanley routinely hired white candidates into lateral positions or even higher titled roles than the white candidate's previous role.

38. For example, Fletcher sourced three candidates holding the same title with similar experience working at the same employer. Morgan Stanley hired the white candidate for a prestigious complex manager position. Morgan Stanley refused to even consider the two African American candidates for complex manager roles and instead hired them into lower management positions, with less compensation.

39. As is industry standard, Fletcher's contract with Morgan Stanley guaranteed him commissions based on a percentage of the hired candidate's first-year guaranteed compensation. Thus, the Firm's practice of paying his diverse candidates less resulted in lower commissions. Morgan Stanley also routinely withheld and obfuscated from Fletcher accurate compensation information about candidates of Fletcher it hired, in an effort to deny him the commissions to which he was entitled.

40. Consistent with its racial bias and race-matching practices, Morgan Stanley also refused to consider the many non-diverse candidates Fletcher presented to the Firm. Fletcher introduced approximately 35 highly qualified white candidates to Morgan Stanley, but the firm did not view Fletcher as capable or worthy of being paid to recruit white candidates. Indeed,

Morgan Stanley even secretly hired a white candidate Fletcher presented without his knowledge or without granting him credit or commission. Tellingly, Morgan Stanley paid that white candidate more and placed him at a higher level than similar Black managers.

41. Morgan Stanley's practices of racial steering and designating certain jobs and markets by race and gender contravened Morgan Stanley's and Fletcher's contract, which stated in relevant part: "The Supplier agrees that it will introduce candidates to Morgan Stanley based on merit alone, and will not discriminate against any potential candidate on the basis of that candidate's race, color, religion, creed, age, gender [incorporating other protected classes] . . . . The Supplier will use its best efforts to present a diverse slate of candidates to Morgan Stanley." In keeping with his contractual obligation, in addition to his own deeply held non-discriminatory beliefs, Fletcher honored the contract by presenting candidates on merit alone, and never discriminating on the basis of race, gender, age, or any other reason. Morgan Stanley, however, routinely discriminated against Fletcher and his candidates by refusing to consider non-African American candidates, and only to the extent that the Firm's arbitrary quota was unmet.

42. Morgan Stanley treated Fletcher differently and worse than other non-Black third-party recruiters in other ways, too. Pursuant to industry standard and Fletcher's contract with Morgan Stanley, Fletcher was entitled to a commission if Morgan Stanley hired any candidate he presented for any position within one year of the submission date. Morgan Stanley, like most large companies, maintains an applicant tracking system that electronically documents every candidate presented by a third-party recruiting firm to ensure that the recruiting firm receives credit and commissions if it hires that candidate. The system also allows the recruiter to track a candidate's progress throughout the hiring process. Although Morgan Stanley granted other recruiting agencies access to the system, it denied Fletcher access to its applicant tracking

system, despite his repeated requests. Indeed, the Head of Wealth Management Talent Acquisition admitted that Fletcher was treated differently and worse, confirming that this "is not how we work with other agencies," and for him, "the process does not work." As a result, Morgan Stanley routinely hired Fletcher's candidates without his knowledge in an attempt to deny him credit and pay.

43. Rather than provide Fletcher access to the standard applicant tracking system, the Firm had no less than 12 individuals to be Fletcher's "point-of-contact" throughout his relationship with Morgan Stanley. This required Fletcher to devote considerable time and resources each time he was assigned a new point of contact, develop new working relationships, and navigate new bureaucracies and processes. Fletcher understands that no other third-party talent acquisitions firms that Morgan Stanley contracted with were subjected to such a tumultuous and inefficient reporting relationship.

44. As a result of Fletcher's differential treatment, Morgan Stanley interviewed and hired at least 11 of Fletcher's candidates without his knowledge. Fletcher only discovered Morgan Stanley hired his candidates after the fact and each time had to fight to try to receive his contractually obligated commissions he had earned. Fletcher is not aware that non-Black recruiting firms had to fight for their commissions or prove that they sourced candidates and were entitled to commissions. Consistent with Morgan Stanley's attempts to use Fletcher's work without paying his contractually obligated commissions, Morgan Stanley smuggled several of Fletcher's candidates without informing Fletcher and without his knowledge, and thereby denied Fletcher substantial commissions.

45. After several of Fletcher's candidates were hired without his knowledge, and after Fletcher spent months attempting to collect the commissions Morgan Stanley was contractually

obligated to pay, Head of Executive Search Matt Dziedzic ("Dziedzic") cut Fletcher's commission rate from the industry standard 33 1/3% to only 20%. Morgan Stanley further reduced Fletcher's compensation by capping commissions and basing commissions on only first-year salary and not on total compensation, excluding all other compensation, such as guaranteed incentive and bonus pay, which were typically the majority of a manager's pay.

46. In approximately 2020, due to Fletcher's stellar performance, Morgan Stanley granted him a "preferred vendor" designation. This designation would increase the types and volume of jobs for which Fletcher could present candidates, from only wealth management field sales to the myriad of other divisions at the Firm, including IT, marketing, and human resources. Fletcher was ecstatic that his hard work would pay off and was eager to extend his work at Morgan Stanley. But Morgan Stanley continued to discriminate against Fletcher by only considering him to fill positions that it had arbitrarily designated as for diverse candidates. Indeed, in the several years Fletcher was a Morgan Stanley preferred vendor, he was only requested to present diverse candidates and Morgan Stanley never hired a candidate he presented, thus denying Fletcher substantial commissions.

47. By 2021, Morgan's Stanley's racist practices had the desired effect of creating a workforce in which African Americans were almost entirely excluded from the Firm's field management ranks, as well as financial advisory workforce:

- None (0) of the 7 Regional Directors were African American.[6]
- Only 6 of the 88 Complex Managers were African American.
- Only 15 of 380 Branch Managers were African American.

[6] In approximately January 2023, Morgan Stanley reduced the number of Regional Directors from 7 to 4. All of the Regional Directors remain white.

- Fewer than 1% of Morgan Stanley's approximately 16,000 financial advisors were African American.[7]
- None of Morgan Stanley's wealth management senior business executives were Black.

48. In approximately fall 2021, Fletcher contacted Morgan Stanley's Global Head of Supplier Diversity Shendora Pridgen ("Pridgen") and again reported the discrimination that he and his candidates were facing. Fletcher told Pridgen about the differential treatment he was experiencing from Dziedzic, among others, as compared to other non-Black recruiters. During their initial meeting, Pridgen voiced concern about the treatment of Fletcher and his candidates and admitted that she had "run ins" with Dziedzic in the past. Pridgen promised to investigate and get back to Fletcher quickly. Fletcher provided Pridgen supporting documents at her request. However, despite numerous emails from Fletcher requesting an update and additional meetings, Pridgen did not follow up with Fletcher for nearly seven months after committing to a follow-up meeting with him the following week.

49. Despite sourcing the white Complex Director candidate, Morgan Stanley refused to pay Fletcher the commissions he earned. Morgan Stanley falsely claimed that Fletcher had not introduced the candidate to the Firm and accused Fletcher of lying. Fletcher produced overwhelming documentary evidence proving he had in fact introduced the white Complex Director candidate. Despite this evidence, Morgan Stanley refused to pay Fletcher the commissions due under his contract. In a further act of discrimination and retaliation, Morgan Stanley rescinded a job offer to a Black candidate that Fletcher sourced, denying him more commissions.

---

[7] *Booker v. Morgan Stanley*, No. 20-cv-2662 (E.D.N.Y. Jan. 14, 2021), ECF 1 at ¶ 126.

50. Nearly seven months after Fletcher raised his concerns of discrimination, Pridgen agreed to meet with Fletcher again in approximately March 2022. During this meeting, Pridgen refused to disclose whether she investigated Fletcher's serious allegations of discrimination, or what, if anything, she did to address them. Fletcher reiterated that Morgan Stanley continued to discriminate against him and his candidates, including Morgan Stanley's refusal to honor its obligation to pay him commissions for the hiring of his white Complex Director candidate.

51. Shortly thereafter, in plain retaliation for reporting discrimination, Morgan Stanley terminated Fletcher's contract. Tacitly conceding its unlawful conduct, Morgan Stanley offered to pay Fletcher the commission for the white Complex Director it unlawfully denied him, but only in exchange for a full release of any and all legal claims and an end to his contract.

52. After Morgan Stanley breached the contract and terminated the agreement, Fletcher continued to seek help for himself and his candidates. He reported his treatment to Morgan Stanley CEO James Gorman ("Gorman"), Head of Morgan Stanley Wealth Management Andy Saperstein ("Saperstein"), and the Board of Directors and requested that the Firm honor its contract with him. Gorman, Saperstein, and the Board never responded to Fletcher.

53. Morgan Stanley's unlawful discrimination and retaliation caused Fletcher to suffer significant financial losses and irreparably damaged Fletcher's career. Morgan Stanley's unlawful discrimination and retaliation further caused Fletcher emotional distress and other non-pecuniary losses.

54. Punitive damages are appropriate because Morgan Stanley's conduct was malicious, and Morgan Stanley was recklessly and callously indifferent to the statutorily protected rights of Fletcher.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

55. Plaintiff Fletcher realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

56. 42 U.S.C. § 1981 guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

57. By the acts and conduct described above, Morgan Stanley engaged in illegal intentional racial discrimination against Plaintiff in violation of 42 U.S.C. § 1981.

58. Plaintiff has been harmed as a direct and proximate result of Morgan Stanley's unlawful conduct.

## COUNT II

### RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

59. Plaintiff Fletcher realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

60. Plaintiff Fletcher alleges that he engaged in protected activity by complaining of his unlawful treatment.

61. Plaintiff Fletcher alleges that he suffered retaliation and harm because of his protected activity, in violation of 42 U.S.C. § 1981.

## COUNT III

## RACE DISCRIMINATION AND RETALIATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW

62. Plaintiff Fletcher realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

63. Morgan Stanley maintains its corporate headquarters in New York City and employs a substantial number of employees in New York City. The contract between Plaintiffs and Morgan Stanley is governed by New York law.

64. The NYCHRL, NYC Admin Code § 8-101, *et seq*., establishes that it is unlawful, because of an individual's race, "to bar or to discharge from employment such person," or to "discriminate against such person in compensation or in terms, conditions or privileges of employment." NYC Admin Code § 8-107. The NYCHRL applies to independent contractors.

65. By its conduct as alleged herein, Defendants unlawfully discriminated and retaliated against Fletcher in violation of NYCHRL.

66. Plaintiff Fletcher has suffered damages as a result of Morgan Stanley's violation of the NYCHRL.

## COUNT IV

## RACE DISCRIMINATION AND RETALIATION IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW

67. Plaintiff Fletcher realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

68. Morgan Stanley maintains its corporate headquarters in New York and employs a substantial number of employees in New York. The contract between Plaintiffs and Morgan Stanley is governed by New York law.

69. The New York State Human Rights Law ("NYSHRL"), NY Exec. Law § 290, *et seq*., establishes that it is unlawful, because of an individual's race, "to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). The NYSHRL applies to independent contractors.

70. By its conduct as alleged herein, Defendants unlawfully discriminated and retaliated against Fletcher in violation of NYSHRL.

71. Plaintiff Fletcher has suffered damages as a result of Morgan Stanley's violation of the NYSHRL.

**COUNT V**

**BREACH OF CONTRACT**

72. Plaintiff Fletcher realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count V of this Complaint.

73. Fletcher and Morgan Stanley entered into a recruitment supplier agreement in 2015. The parties renewed that agreement on several occasions until Morgan Stanley terminated the contract in 2022.

74. Fletcher performed all of his obligations under the contract and satisfied all conditions precedent to Morgan Stanley's obligations under the contract.

75. Under the agreement, Morgan Stanley was required to pay Fletcher all placement fees within 60 days of the employee's start date, or the date Morgan Stanley received an invoice, whichever was later.

76. Morgan Stanley refused to pay placement fee commissions that Fletcher was otherwise entitled to in breach of the recruitment supplier agreement.

77. Moreover, every contract includes an implied covenant of good faith and fair dealing. That covenant governs a party's exercise of discretion under the contract. To the extent Morgan Stanley had contractual discretion, it exercised that discretion in bad faith to deny Plaintiff the contractual benefits he was entitled to.

78. As a direct and proximate result of Morgan Stanley's breach of contract, Plaintiff suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the entry of judgment in his favor and against Defendants as follows:

a. Declare that the acts and conduct of Defendants are unlawful and violate 42 U.S.C. § 1981, the NYSHRL, the NYCHRL, and the recruitment supplier agreement;

b. Award Plaintiff the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

c. Award Plaintiff the value of all compensation and benefits he will lose in the future as a result of Defendants' unlawful conduct;

d. Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

e. Award Plaintiff punitive damages due to Defendants' malicious conduct and/or their reckless or callous indifference to the statutorily protected rights of Plaintiff;

f. Award Plaintiff prejudgment interest;

g. Award Plaintiff attorneys fees, costs, and disbursements; and

h. Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Dated: May 3, 2023

Respectfully Submitted,

*/s/ Suzanne E. Bish*
*Attorney for the Plaintiff*

Linda D. Friedman
Suzanne E. Bish
George S. Robot
STOWELL & FRIEDMAN, LTD.
303 W. Madison
Suite 2600
Chicago, Illinois 60606
(312) 431-0888
lfriedman@sfltd.com
sbish@sfltd.com
grobot@sfltd.com

Benjamin L. Crump (*pro hac vice* forthcoming)
BEN CRUMP LAW, PLLC
122 S. Calhoun St.
Tallahassee, FL 32301
(800) 713-1222
court@bencrump.com

Nabeha Shaer (*pro hac vice* forthcoming)
BEN CRUMP LAW, PLLC
633 Pennsylvania Ave NW, Fl. 2
Washington, DC 20004
800-958-1444
nabeha@bencrump.com